## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DONE,<br><br>　　　　　*Plaintiff*,<br><br>　　v.<br><br>DISTRICT OF COLUMBIA,<br><br>　　　　　*Defendant*. | Civil Action No. 1:19-cv-01173 (CJN) |

## MEMORANDUM OPINION

Plaintiff Jane Doe, a former District of Columbia employee, alleges that she was sexually harassed and assaulted by another employee, Richard Roe.  In her suit against the District, Doe brings sexual harassment and retaliation claims under the D.C. Human Rights Act and Title VII of the Civil Rights Act of 1964 as well as a common-law negligent supervision claim.  The District has moved for summary judgment, arguing primarily that Doe unreasonably delayed in complaining to her supervisor about the harassment and that she never suffered any retaliatory employment action.  Doe, in turn, seeks partial summary judgment on several of the District's defenses.  Doe has also moved for sanctions because of the District's failure to preserve text messages of critical witnesses.  For the reasons explained below, the Court denies the District's motion for summary judgment and grants in part both Doe's cross-motion for partial summary judgment and her motion for sanctions.

### Background

In February 2017, Jane Doe was hired by the District of Columbia as a social worker in the School Mental Health Program of the Department of Behavioral Health (DBH), which provides

mental health services in D.C. public schools.[1]  Pl.'s Resp. to Def.'s Statement of Material Facts & Statement of Undisputed Material Facts ("Pl.'s SOMF") ¶¶ 25–26, ECF No. 76-1; *see* Pl.'s Ex. 46 (Amended Offer Letter) at 1, ECF No. 78-49.  District of Columbia Public Schools (DCPS), another D.C. government agency, is also involved in implementing the School Mental Health Program.  *See* Pl.'s SOMF ¶ 26; Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ("Def.'s Resp.") ¶ 26, ECF No. 82-1; Pl.'s Ex. 49 (Mem. of Agreement), ECF No. 78-52.  An agreement between DBH and the Principal of the elementary school where Doe was assigned to work stated that Doe would be "supervised by, report [her] hours to, obtain work assignments from, and ask for leave from DBH."  Def.'s Ex. B (Agreement to Proceed) ¶ 8, ECF No. 71-1; Def.'s Statement of Undisputed Material Facts ("Def.'s SOMF") ¶ 2, ECF No. 72-1.  However, the Principal had discretion as to whether the school participated in the program, and also had the authority to remove Doe from her placement at the school.  Pl.'s SOMF ¶¶ 31–32, 46.

Along with the Principal, the administrative team at the school included Assistant Principal Richard Roe and Director of Strategy and Logistics Roberta Kleekpo, who were authorized to supervise school staff.  *Id.* ¶ 28.  The Principal assigned Roe to oversee Doe's work.  *Id.* ¶¶ 35, 38–39; Pl.'s Ex. 11 (Principal Tr.) at 54, 63–64, ECF No. 78-14.  As a result, Doe provided services "under the guidance" of the Principal and Roe.  Pl.'s SOMF ¶ 36; Pl.'s Ex. 15 (Doe Tr.) at 33, ECF No. 78-18.  For instance, they would "tell [Doe] when [she] could meet with students," and Doe needed their approval to provide therapy in groups.  Pl.'s Ex. 15 (Doe Tr.) at 59–60.  While Doe's performance was ultimately evaluated by her supervisor at DBH, Luis Morales, Morales would consider the performance reviews completed by school administrators, including Roe.  Pl.'s

---

[1] Unless otherwise noted, these facts are undisputed or established by uncontroverted evidence, at least at the summary judgment stage.

SOMF ¶¶ 42–43, 46.  Doe understood from comments made by Morales that she was at the "mercy" of the Principal and Roe because they "could have her removed from the [school] if they determined her performance did not meet their expectations," and they "could discipline her and lower her performance rating."  *Id.* ¶¶ 46–47 (quotation omitted).

Upon starting her employment as a school social worker, Doe underwent a new employee orientation.  Def.'s SOMF ¶¶ 6–7.  One section of the orientation informed employees about what they should do if they experienced sexual harassment in the workplace—"specifically that they should complain to their supervisor or an EEO counselor or file a formal complaint with the District's Office of Human Rights."  *Id.* ¶ 8; *see* Def.'s Ex. G (Prince Aff.) ¶ 7, ECF No. 71-1 (stating that employees were told they should complain "both orally and in writing").

Doe claims that beginning in April 2017—soon after she started working at the school—Roe began to harass her, and that the harassment continued through January 2018.  Def.'s SOMF ¶ 9; Pl.'s SOMF ¶ 9.  In an early instance of unwelcome conduct, Roe "abruptly kissed" her in his office "without her consent."  Pl.'s SOMF ¶ 48.  Doe claims that in the months following that incident, Roe

> continuously, and on numerous occasions, harassed [her] by touching her in an
> unwelcome manner, groping her breasts or her butt without her consent,
> commenting on her physical appearance in an unwelcome manner, looking at her
> in a sexualized and unwelcomed manner, sending her inappropriate text messages
> including photographs of himself, following her, grabbing her personal items, and
> repeatedly coming unannounced to the room in which she worked.

Def.'s Ex. H (Pl.'s Interrog. Resps.) ¶ 4, ECF No. 71-1; Def.'s SOMF ¶ 9; *see also*, *e.g.*, Pl.'s SOMF ¶¶ 49–53.

Doe also alleges that Roe pressured her into having sex with him in May 2017.  Def.'s SOMF ¶ 9.  Roe had asked Doe that month if she was interested in a permanent position as a social worker at the school, insinuating that the job prospect depended on her having a sexual relationship

with him.  Pl.'s SOMF ¶ 54.  After the two had sex, they began a "consensual affair" (Roe was married).  Pl.'s Ex. 30 (Prince Report, Doe Statement) at 57, ECF No. 78-33.  Doe planned a trip to Puerto Rico, and Roe booked an airline reservation and met her there after he learned of the trip. Pl.'s SOMF ¶ 58.

By the end of July, according to Doe, her sexual interactions with Roe were no longer consensual.  *Id.* ¶¶ 59–60 (recounting a time when Roe encouraged Doe to drink more alcohol when she was intoxicated and took advantage of her by having sex with her); Def.'s Resp. ¶¶ 59–60 (stating that Doe and Roe "had a consensual relationship until the end of July 2017" and acknowledging Doe's testimony about the incident involving her intoxication (quotation omitted)); *see* Pl.'s Ex. 30 (Prince Report, Doe Statement) at 61.  In August, Roe began to pursue her more aggressively, repeatedly calling and texting her, visiting her classroom on a daily basis, and groping her without her consent.  Pl.'s SOMF ¶ 61; Pl.'s Ex. 30 (Prince Report, Doe Statement) at 58–59.  Around September, Doe explicitly told Roe that she was no longer interested in a romantic or sexual relationship; and while Roe agreed to stop pursuing her romantically, he became even more aggressive.  Pl.'s SOMF ¶¶ 62–66.  Doe alleges that Roe called her and asked her to come to the school after hours, claiming that he was having car trouble—but after she arrived and the two went to dinner, Roe sexually assaulted her despite her clear statements that she did not consent. *Id.* ¶ 83; Pl.'s Ex. 15 (Doe Tr.) at 168–71.  And she claims that in October, Roe entered her classroom, locked the door, and penetrated her vagina even though she told him to stop.  Pl.'s SOMF ¶ 113.  Doe began to avoid working at the school building whenever possible, but Roe continued to harass her at the school and by text message.  *Id.* ¶ 115.

Doe first complained to Morales during one of their weekly supervisory meetings in September 2017, five months after she claims that the harassment began.  Def.'s SOMF ¶ 10.  Doe

asserts that, leading up to her report to Morales, she was hesitant about the consequences of coming

forward. She "was initially fearful of resisting Mr. Roe's advances and reporting his conduct to

anyone because of his authority . . . and ability to affect her job status," though the District submits

that other reasons—including her fear about people finding out that she was previously involved

in a relationship with him—also made her hesitant. Pl.'s SOMF ¶¶ 70, 76; Def.'s Resp. ¶ 70. Doe

also asserts that she "was uncomfortable sharing Mr. Roe's conduct with the Principal because

[the Principal] was friends with Mr. Roe, and because [Doe] knew from past experience that the

Principal reacted nonchalantly to instances of sexual harassment in the school." Pl.'s SOMF

¶¶ 71–73. School employees had told Doe that the Principal and Roe were both "vindictive" and

that she should "be careful" around them. *Id.* ¶ 75 (quotations omitted). Other social workers also

warned Doe that DBH management would retaliate against her if she made complaints, which

caused her to hesitate about reporting Roe's conduct to Morales or other DBH employees. *Id.*

¶ 77.

Doe's first complaint to Morales in September 2017 came after Morales commented that

he had observed Roe "entering her classroom without apparent justification." *Id.* ¶¶ 84–85. Doe

told Morales that "Roe was harassing and stalking her." *Id.* ¶ 85 (quotation omitted). Morales, in

response, said that Roe was also sexually harassing *him*. *Id.* ¶ 86. By October, Doe had told

Morales that Roe continued to visit her office, interrupting her work and talking about his personal

life. Pl.'s Ex. 31 (Morales Statement) at 431, ECF No. 78-34; Pl.'s Ex. 5 (Morales Tr.) at 117–18,

ECF No. 78-8. According to Doe, she also told Morales that Roe "sent her frequent unwelcome

text messages, had asked her out . . . , had sent her inappropriate pictures, had grabbed her personal

belongings in an aggressive manner, [and] had touched her inappropriately." Pl.'s SOMF ¶ 85;

Pl.'s Ex. 15 (Doe Tr.) at 174, 185–87; *see* Def.'s SOMF ¶ 11. And she informed Morales in early

October that Roe "placed his hands on her shoulders while she was working, and began massaging her shoulders," and that she "jumped in reaction" and told him that "he was making her uncomfortable."  Pl.'s SOMF ¶ 99.

In response to the latter complaint, Morales "shook his head and said 'oh, my God,'" "put his hands up to his ears and told [Doe] not to say any more," and "indicated that he would email his supervisor Ms. Barnes," who oversaw DBH's participation in the School Mental Health Program, "about the incident."  *Id.* ¶¶ 32, 99; Def.'s Resp. ¶ 99; Pl.'s Ex. 15 (Doe Tr.) at 186; Pl.'s Ex. 4 (Pl.'s Am. Interrog. Resps.) ¶ 5, ECF No. 78-7.  Morales then told Barnes that Roe had been visiting Doe repeatedly and had touched *his* (Morales's) shoulder.  Pl.'s SOMF ¶¶ 100–01. Morales did not tell Barnes that Roe had touched *Doe* inappropriately.  *Id.* ¶ 102.

At some point in October, Doe offered to share text messages from Roe with Morales as proof of harassment, but Morales responded:  "Don't send them to me.  I don't want them."  *Id.* ¶ 108; Pl.'s Ex. 1 (Doe Decl.) ¶ 13, ECF No. 78-4.  And during a meeting that fall led by Morales and attended by several social workers that he supervised, after Doe stated that she was "having some issues with the assistant principal at her school," Morales jokingly said:  "Yeah, [Doe] and I are both being sexually harassed by the assistant principal."  Pl.'s SOMF ¶ 112; Pl.'s Ex. 2 (Fakunle Decl.) ¶ 2, ECF No. 78-5.

Morales otherwise responded to Doe's complaints by instructing her to place signs on her classroom door noting when she was in session, to tell Roe that she was busy, and to lock her door. Pl.'s SOMF ¶ 91; Def.'s Resp. ¶ 91; Pl.'s Ex. 31 (Morales Statement) at 431.  That effort failing, Morales texted Doe that he would request a meeting with the Principal.  Def.'s SOMF ¶ 14; Pl.'s SOMF ¶¶ 92–93.  Doe responded that she preferred not to meet with the Principal; she explained that she had told Roe that day to discontinue his behavior, and she expressed her concern that the

Principal would "just become vindictive too."  Def.'s SOMF ¶ 15; Def.'s Ex. I (Doe and Morales Text Messages) at 15, ECF No. 71-1.  But Doe agreed that if Roe's behavior continued, a meeting with the Principal would be necessary.  Def.'s Ex. I (Doe and Morales Text Messages) at 16.  Ten days later, Doe texted Morales that she believed the situation with Roe was "handled" but that she would "follow [Morales's] lead."  Def.'s SOMF ¶ 16; Def.'s Ex. J (Doe and Morales Text Messages) at 18, ECF No. 71-1.

Meanwhile, Doe also reported to Kleekpo (in late September or early October) that Roe "kept asking [her] out, and that he was sending [her] inappropriate texts."  Pl.'s Ex. 15 (Doe Tr.) at 177–80.  By text in October, Doe told Kleekpo that Roe asked to meet with her, and Kleekpo responded:  "Be careful, keep one [eye] open."  Pl.'s Ex. 38 (Doe and Kleekpo Text Messages) at 214, ECF No. 78-41.  When Doe texted Kleekpo that she "sent [Roe] a long text telling him I don't like what's happening," Kleekpo messaged back:  "I understand how you feel though, because sometimes you can just resolve the problem on your own and it is better, than talking to the person[']s boss"; "Luis [Morales] just doesn't see things as they are since he is not at the school"; and "Maybe you can talk to [the Principal] but let her know you already spoke to [Roe]."  *Id.* at 219.  When Doe told Kleekpo about Morales's plan to meet with the Principal, Kleekpo responded that it was a bad idea.  Pl.'s SOMF ¶ 121.

After Morales scheduled a meeting with the Principal, Roe "cornered" Doe in her classroom, inquiring about the subject of the meeting.  *Id.* ¶ 122.  This confrontation frightened Doe about further reporting Roe's conduct, but she did inform Morales it had happened.  *Id.* ¶¶ 123–24.  Doe asked Morales to report Roe's conduct to a DCPS official other than the Principal, but Morales refused.  *Id.* ¶ 125.  During the meeting among the Principal, Doe, and Morales, which occurred in November, the Principal stated that she knew about Roe's unwelcome visits to Doe's

classroom and attributed the issue to Doe's likeable personality.  *Id.* ¶¶ 132–33; Pl.'s Ex. 15 (Doe Tr.) at 197–99.

Roe's harassment of Doe—including sending repeated text messages, visiting her throughout the school day, and groping her without her consent in the school building—continued after that meeting.  Pl.'s SOMF ¶¶ 138–44.  Doe informed Morales by text message in December that Roe was coming to her office and talking to her for hours at a time.  *Id.* ¶ 147; Pl.'s Ex. 40 (Doe and Morales Text Messages) at 68916, ECF No. 78-43.  Morales did not seek a further meeting with the Principal, explaining that his focus at that time was that Doe completed her work. Pl.'s SOMF ¶¶ 148–49.

Doe filed a complaint with the District's Office of Human Rights (OHR) on January 8, 2018, reporting nonconsensual sex with Roe.  *Id.* ¶ 193; Def.'s SOMF ¶ 18.  Two days later, she contacted DBH's Equal Employment Office (EEO) about filing a sexual harassment complaint. Pl.'s SOMF ¶ 194.  Morales revealed details about Doe's complaint to her coworkers (including that Doe had a romantic relationship with Roe), which contravened District policies requiring that reports and investigations of sexual harassment be kept confidential.  *Id.* ¶¶ 202–07.

On January 18, Doe was removed from the school and informed that if she planned to come to work, she would have to work at a different office, where she could read and "work on notes" while awaiting a specific assignment.  *Id.* ¶ 199; Pl.'s Ex. 40 (Doe and Morales Text Messages) at 68923–24.  Doe took personal leave and then reported to the office as instructed.  Pl.'s SOMF ¶ 200.  In April, Barnes told Doe that she would be transferred out of the school, but the transfer was rescinded two days later after Doe informed Barnes that she did not want a transfer and that she would report it as retaliatory.  *Id.* ¶ 211.  Roe resigned in July 2018 after months of paid administrative leave and investigations by both DBH and DCPS.  *Id.* ¶¶ 201, 213, 219; Pl.'s Ex.

36 (Roe Resignation Notice), ECF No. 78-39.  Doe remained at the school until March 2019, when she left voluntarily.  Def.'s SOMF ¶ 23.  Doe filed her lawsuit pseudonymously against the District in April 2019.  *See* Compl., ECF No. 3.  Her Amended Complaint includes claims of sexual harassment and retaliation under the D.C. Human Rights Act (DCHRA) and Title VII as well as a common-law claim of negligent supervision.  *See* Am. Compl., ECF No. 13.  In its Answer, the District asserted several defenses.  *See* Answer, ECF No. 14.

During the course of discovery, Doe learned of the District's failure to preserve text messages of Roe, the Principal, and Morales.  In particular, on August 26, 2019, Doe served a request for production seeking (among other things) text messages referring or relating to Doe, as well as communications relating to performance evaluations of Doe, Roe, the Principal, Morales, and Barnes; Roe's separation of employment from DCPS; and discipline considered or imposed on Doe, Roe, the Principal, Morales, and Barnes.  Pl.'s Ex. A (Pl.'s First Set of Doc. Reqs.) at 5, ECF No. 58-1; *see also id.* at 2–3 (defining "[c]ommunication" to include "text messages").  The District produced only certain text messages that Roe had submitted as part of an initial investigation into Doe's complaints.  Pl.'s Mot. to Compel Produc. of Docs. ("Pl.'s Mot. to Compel") at 6, ECF No. 31.  On June 25, 2020, Doe moved to compel production of additional text messages from the Principal's and Roe's government-issued phones.  *Id.* at 5–6, 9.  In opposition to that motion, the District informed Doe that Roe's "government-issued phone was returned at the end of his employment, wiped of data, and likely re-issued, as is customary."  Def.'s Opp'n to Pl.'s Mot. to Compel at 10, ECF No. 33.  The District further stated that, although the Principal was still employed by the District, "she recently lost her government phone and has yet to be provided a new one."  *Id.*  For these reasons, the District conveyed that it could not produce

additional text messages and suggested that while those circumstances were "unfortunate," they should be addressed through a spoliation motion instead of a motion to compel.  *Id.* at 10 n.6.

That motion came on May 5, 2021, when Doe sought sanctions for the District's failure to preserve the text messages of Roe, the Principal, and Morales.  *See* Pl.'s Mot. for Sanctions for Spoliation of Evidence ("Pl.'s Mot. for Sanctions"), ECF No. 57.  A deposition of the Principal revealed that not only did she lose her government phone, but her text messages were also deleted from the previous government phone that she had used during the 2017–2018 school year (when she moved to a different school and received a new phone).  Pl.'s Ex. I (Principal Tr.) at 92–94, ECF No. 58-9.  As for Morales, he testified that the text messages before approximately November 2018 were deleted from his government phone when he updated his password, and text messages on his personal phone were also deleted.  Pl.'s Ex. H (Morales Tr.) at 74–75, 79–81, ECF No. 58-8.  Morales had, however, retained certain messages between himself and Doe by taking pictures of them and emailing them to himself.  *Id.* at 69–74.

All three testified that they were never instructed to preserve text messages.  Pl.'s Ex. I (Principal Tr.) at 95–96; Pl.'s Ex. H (Morales Tr.) at 75–76; Pl.'s Suppl. Ex. 1 (Roe Tr.) at 65, 70, ECF No. 78-57.  DCPS's designated 30(b)(6) deponent testified that the D.C. Attorney General's Office sent a litigation hold notice to DCPS's general counsel's office in May 2019, but that letter was not forwarded to the relevant employees, including Roe and the Principal.  Pl.'s Ex. M (Woods-Jefferson Tr.) at 46–50, ECF No. 58-13.  DBH's 30(b)(6) designee testified that DBH issued a litigation hold notice to its employees, including Morales, on March 6, 2018, and in May 2019.  Pl.'s Ex. K (Tapp Tr.) at 144, 148–51, 162–63, ECF No. 58-11.

The Court deferred decision on the sanctions motion until its ruling on any motions for summary judgment.  *See* Oct. 29, 2021 Minute Order.  The District then moved for summary

judgment on Doe's claims for sexual harassment and retaliation.  *See* Def.'s Mot. for Summ. J.,

ECF Nos. 72, 84-1.  Doe cross-moved for partial summary judgment on several of the defenses

asserted in the District's Answer.  *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. & Cross-Mot. for

Partial Summ. J. ("Pl.'s Cross-Mot. for Summ. J."), ECF No. 76.  Upon full briefing of those

motions and oral argument, the summary judgment motions and the sanctions motion are now ripe

for review.

### Legal Standards

A court may grant summary judgment "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The moving party is entitled to summary judgment "only if the nonmoving party fails to

make a showing sufficient to establish the existence of an essential element to that party's case,

and on which that party will bear the burden of proof at trial."  *Czekalski v. Peters*, 475 F.3d 360,

363 (D.C. Cir. 2007) (quotation omitted).  The Court considers cross-motions for summary

judgment "on an individual and separate basis, determining, for each side, whether a judgment

may be entered in accordance with the Rule 56 standard."  10A Charles Alan Wright, et al., *Federal

Practice and Procedure* § 2720 (4th ed. 2022).  In doing so, the Court "view[s] the evidence in the

light most favorable to the nonmoving party," "draw[s] all reasonable inferences" in that party's

favor," and "eschew[s] making credibility determinations or weighing the evidence."  *Czekalski*,

475 F.3d at 363.

Under Federal Rule of Civil Procedure 37(e), the Court may sanction a party "[i]f

electronically stored information that should have been preserved in the anticipation or conduct of

litigation is lost" because that party "failed to take reasonable steps to preserve it," and the

information "cannot be restored or replaced through additional discovery."  Fed. R. Civ. P. 37(e).

Sanctions issued "upon finding prejudice to another party from loss of the information" may be "no greater than necessary to cure the prejudice." *Id.*

**Analysis**

I.      **Cross-Motions for Summary Judgment**

      A.  **The District Is Not Entitled to Summary Judgment on Doe's Sexual Harassment Claims**

Doe's first and second claims against the District are for sexual harassment in violation of the DCHRA, D.C. Code § 2-1402.11(a)(1) (Count I) and a hostile work environment caused by sexual harassment in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1) (Count II). *See* Am. Compl. at 16–18. "The anti-discrimination provisions of both statutes are substantially similar." *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 n.17 (D.C. 1993). An employer violates Title VII by creating a hostile work environment when sexual harassment in the workplace is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotation omitted). For a sexual harassment claim under the DCHRA, the plaintiff must demonstrate "(1) that he is a member of a protected class, (2) that he has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment." *Daka, Inc. v. Breiner*, 711 A.2d 86, 92 (D.C. 1998); *see Purcell v. Thomas*, 928 A.2d 699, 710–11 (D.C. 2007).

An employer may be directly liable for harassment by the victim's coworker if the employer was "negligent in controlling working conditions"—that is, "if the employer knew or reasonably should have known about the harassment but failed to take remedial action." *Vance v. Ball State Univ.*, 570 U.S. 421, 424, 427 (2013). Alternatively, if the harasser is the victim's "supervisor," rather than her coworker, the employer can be vicariously liable through one of two

12

pathways.  First, "an employer is strictly liable for supervisor harassment that culminates in a tangible employment action."  *Pa. State Police v. Suders*, 542 U.S. 129, 137 (2004) (quotation omitted).  Second, if "supervisor harassment [is] unaccompanied by an adverse official act," an employer is liable unless it proves, as an affirmative defense, that (1) "the employer exercised reasonable care to prevent and correct any harassing behavior" and (2) "the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.*; *Vance*, 570 U.S. at 424, 429–30 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).  An employee is a "supervisor" for the purpose of vicarious liability if he "is empowered by the employer to take tangible employment actions against the victim."  *Vance*, 570 U.S. at 424, 431.  A "tangible employment action," in this context, is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Id.* at 429 (quotation omitted).

Doe claims that Roe sexually harassed her in the form of "numerous unwelcome sexual comments, unwelcome touching, and sexual assault," which created a hostile workplace and was not "appropriately addressed" by the District.  Am. Compl. ¶¶ 105, 113.  In its summary judgment motion, the District makes two main arguments.  The District first contends that Roe was not Doe's supervisor, such that the District cannot be vicariously liable for his harassing conduct.  Def.'s Mot. for Summ. J. at 5–6.  The District also contends that, even if Roe was Doe's supervisor, it is entitled to the *Faragher-Ellerth* defense as a matter of law:  the District exercised reasonable care to prevent and promptly correct the sexually harassing behavior, and Doe unreasonably failed to take advantage of preventive or corrective opportunities that it provided.  *Id.* at 7–11.  As Doe points out in her opposition, both arguments relate to vicarious liability—the District did not, in

its summary judgment motion, address any allegation of negligence.  Pl.'s Cross-Mot. for Summ.

J. at 21.  In its reply, the District contends that Doe did not advance a negligence theory in her

Amended Complaint and cannot do so for the first time in opposition to its summary judgment

motion.  Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J. & Reply in Further Support of Def.'s Mot.

for Summ. J. ("Def.'s Reply") at 3, ECF No. 82.

The Court agrees with the District only to a limited extent.  Doe's Amended Complaint

alleges twice—in relation to both her DCHRA claim and her Title VII claim—that "managers and

supervisors" of the D.C. government "knew about the harassment [suffered by Doe] beginning in

August or September of 2017, or earlier, yet took no adequate action to address it."  Am. Compl.

¶¶ 109, 117.  The Amended Complaint does not allege that the District failed to adequately respond

to harassment reports about Roe brought by *other* women *before* August or September of 2017, or

that the District failed to adequately train its managers.  *See* Pl.'s Cross-Mot. for Summ. J. at 24–26

(arguing that a reasonable jury could find negligence based on these facts).  Doe cannot amend her

claims through her opposition to the District's motion to base a claim of direct liability on events

occurring before August or September 2017.  *See, e.g.*, *Kingman Park Civic Ass'n v. Gray*, 27 F.

Supp. 3d 142, 160 n.7 (D.D.C. 2014).

But the Amended Complaint does allege a negligence theory based on the District's

knowledge of Roe's harassment of Doe *after* Doe's complaints in August or September 2017 and

the District's response.  *See* Pl.'s Cross-Mot. for Summ. J. at 21–24; *see also* Am. Compl. ¶¶ 59–61

(alleging that Doe reported Roe's harassment in August or September 2017).  This negligence

theory features a permissible "alternative legal characterization" of Roe's supervisory status, not

a "new substantive claim or even a new factual theory of liability."  *Whitaker v. Milwaukee Cnty.*,

772 F.3d 802, 808–09 (7th Cir. 2014).  The District's failure to address this negligence theory in

its motion precludes summary judgment on it, and thus Doe's negligence theory can proceed based on the District's knowledge of Roe's harassment *after* Doe's complaints in September 2017 and the District's response.[2]

As for the District's argument relating to vicarious liability, the Court disagrees that no reasonable jury could find the District vicariously liable for Roe's harassing conduct.  To start, the record could support a finding that Roe qualifies as Doe's "supervisor."   Again, under the *Faragher-Ellerth* framework, a "supervisor" is an individual with authority "to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance*, 570 U.S. at 431 (quotation omitted).  That definition also encompasses situations in which an employer "confine[s] decisionmaking power to a small number of individuals," who "have a limited ability to exercise independent discretion when making decisions" and "rely on other workers who actually interact with the affected employee." *Id.* at 447.  In that circumstance, "the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Id.*  Lower-level managerial employees may therefore take on "supervisor" status, even though they lack ultimate decisionmaking authority, if they have "the power to *recommend* or otherwise substantially influence tangible employment actions" and "can thus indirectly effectuate them." *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 738 (10th Cir. 2014); *see also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (en banc) (stating that an employee may be considered a supervisor even if he does "not have the final say as to the tangible employment action").

---

[2] Similarly, the District failed to move for summary judgment on Doe's negligent supervision claim and only briefed that claim in its reply.  The Court therefore will not consider the District's arguments pertaining to that claim here.

A reasonable jury could conclude that Roe possessed this kind of delegated supervisory authority from higher-level supervisors.  The Parties agree that the Principal had the authority to remove Doe from her position at the school and that the Principal assigned Roe to oversee Doe's work there.  Pl.'s SOMF ¶¶ 31, 35; Def.'s Resp. ¶¶ 31, 35.  Roe also undisputedly participated in Doe's performance review, which Morales considered when evaluating Doe's performance.  Pl.'s SOMF ¶¶ 42, 46; Def.'s Resp. ¶¶ 42, 46.  A reasonable jury could therefore conclude that Roe had authority to "recommend or otherwise substantially influence" the Principal's decision of whether to retain Doe at the school and her employment as a mental health clinician through DBH.  *Kramer*, 743 F.3d at 738 (emphasis omitted).  Roe's authority to control Doe's removal from the school is further supported by Morales's statement to Doe that the Principal or Roe could have her removed from the school if they determined that her performance did not meet expectations, leaving her at their "mercy."  Pl.'s Ex. 15 (Doe Tr.) at 49–51.  Though an employee's supervisor status is often a question that can be resolved before trial as a matter of law, *see Vance*, 570 U.S. at 443–44, here there is a genuine dispute over Roe's status as a supervisor.

A genuine dispute also exists over whether the District is entitled to the *Faragher-Ellerth* affirmative defense.  As an initial matter, the Court disagrees with Doe that the affirmative defense is unavailable (or irrelevant) because Roe's harassment led to a tangible employment action.  *See* Pl.'s Cross-Mot. for Summ. J. at 33–35.  Doe argues that the District is strictly liable for Roe's harassment because that conduct led to her removal from the school in January 2018 after she filed a complaint with OHR.  *Id.* at 34.  But Doe does not contend that *Roe* effectuated that removal. As the Court of Appeals explained in *Jones v. D.C. Department of Corrections*, "the tangible employment action establishes the requisite link between a supervisor's injurious conduct in the

workplace and the employing enterprise," so "it must be an action *done by the supervisor whose conduct has generated the employee's claim*."  429 F.3d 276, 279 (D.C. Cir. 2005).

Because the District's alleged vicarious liability is not based on a tangible employment action taken by Roe, the question becomes whether the District can nevertheless be vicariously liable for Roe's conduct because it cannot establish the *Faragher-Ellerth* affirmative defense.  To prevail at this stage, the District must show (1) that it "exercised reasonable care to prevent and promptly correct any harassing behavior" and (2) that Doe "unreasonably failed to take advantage of any preventive or corrective opportunities that were provided" as a matter of law.  *Vance*, 570 U.S. at 430.

As to the first question, the District argues that it exercised reasonable care because it instructed employees through DBH's orientation that they "should complain to their supervisor or an EEO counselor or file a formal complaint with the District's Office of Human Rights" if they experience sexual harassment; because Morales responded to Doe's first complaints in September 2017 by making signs to post on her classroom door that were designed to keep Roe from entering; and because Doe and Morales met with the Principal when Roe's harassment continued.  Def.'s Mot. for Summ. J. at 8.  While proof of an anti-harassment policy is relevant to the question of reasonable care, it is not dispositive.  *See Vance*, 570 U.S. at 448 (addressing evidence of an "adequate anti-harassment policy" as relevant to the affirmative defense (quotation omitted)); *see also Brokenborough v. D.C.*, 236 F. Supp. 3d 41, 53 (D.D.C. 2017) (stating that "the existence of an anti-harassment policy may not be, by itself, sufficient"); *Smith v. Ergo Sols., LLC*, No. 14-382, 2019 WL 147718, at *15–16 (D.D.C. Jan. 9, 2019).  Other evidence, beyond the existence of an anti-harassment policy, may show that the employer did not act reasonably and promptly to correct harassing conduct.

Here, the District's examples of corrective conduct (placing signs on Doe's door and arranging a meeting with the Principal) could easily support the opposite conclusion, that is, that the District acted *unreasonably* in response to Doe's complaints.  Those measures did not stop the harassment, and the District offers no evidence that the Principal or Morales took further action to redress Roe's conduct either after the November meeting or after Doe reported continued harassment.  *See* Pl.'s SOMF ¶¶ 93–94, 147–49; Def.'s Resp. ¶¶ 93–94, 147–49.  In addition, a reasonable jury could conclude that Morales's and Kleekpo's reactions to Doe's complaints—the former responding by covering his ears and telling Doe not to send him Roe's harassing texts as proof, and the latter failing to report her complaints—support a finding that the District responded unreasonably.  *See* Pl.'s SOMF ¶¶ 78–80, 99, 108.[3]

As to the second question, the District argues that Doe unreasonably failed to take advantage of preventive or corrective opportunities by delaying in complaining to Morales about Roe's harassing conduct.  Def.'s Mot. for Summ. J. at 9.  In particular, the District emphasizes that Doe waited until five months after the harassment began (in April) to make her first complaint (in September).  *Id.* at 9–10.  The District also highlights information Doe omitted from her reports—including her allegations that she was sexually assaulted.  *See id.* at 11.  But the District offers no authority to support its position that a victim's failure to report every form of harassing conduct that she experienced renders her reports unreasonable.  Instead, the controlling inquiry is

---

[3] The District suggests for the first time in its reply that it exercised reasonable care to prevent and promptly correct Roe's sexually harassing behavior because Doe did not complain in a manner that aligned with the District's anti-harassment policy until January 2018, when she filed a formal complaint with OHR.  Def.'s Reply at 14 (arguing that Doe was required to complain to her supervisor in writing).  This argument is at odds with the concession made in the District's summary judgment motion that Doe complained to her supervisor in a manner that warranted a corrective response in September 2017, *see* Def.'s Mot. for Summ. J. at 8, and because it was presented for the first time in the District's reply, the Court declines to consider the argument now.

whether, as a matter of law, "a reasonable person in [Doe's] place would have come forward early enough to prevent [Roe's] harassment from becoming severe or pervasive." *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quotation omitted). This standard is "not intended to punish the plaintiff merely for being dilatory." *Id.* at 674.

A genuine dispute exists over whether Doe's conduct satisfies *Faragher-Ellerth*'s second prong. The Court of Appeals has recognized that delay may be reasonable due to "fear and uncertainty," and the question of reasonableness may be "for the jury to decide." *Roebuck v. Washington*, 408 F.3d 790, 795 (D.C. Cir. 2005). Doe has offered evidence that, prior to her September report to Morales, she was warned by other employees against reporting misconduct to the Principal and to DBH management, which could support a finding that her delay was reasonable. *See* Pl.'s SOMF ¶¶ 75–77; *Taylor v. Solis*, 571 F.3d 1313, 1319 (D.C. Cir. 2009) ("fear of retaliation" that is "genuine" and "reasonable" may justify a failure to complain (quotation omitted)); *see also Minarsky v. Susquehanna Cnty.*, 895 F.3d 303, 315 (3d Cir. 2018) (distinguishing situations "in which the employee's fear of retaliation is generalized and unsupported by evidence" from fear that is "substantiated by evidence in the record").

**B. The District Is Not Entitled to Summary Judgment on Doe's Retaliation Claims**

In her third and fourth claims, Doe alleges unlawful retaliation under the DCHRA, D.C. Code § 2-1402.61(a) (Count III) and Title VII, 42 U.S.C. § 2000e–3(a) (Count IV). *See* Am. Compl. at 18–20. To establish a prima facie case of retaliation under both statutes, a plaintiff must demonstrate that (1) she "engaged in protected activity," (2) she "was subjected to adverse action by the employer," and (3) "there existed a causal link between the adverse action and the protected activity." *Jones v. WMATA*, 205 F.3d 428, 433 (D.C. Cir. 2000) (Title VII) (quotations omitted); *see Hollins v. Fed. Nat'l Mortg. Ass'n*, 760 A.2d 563, 579 (D.C. 2000) (DCHRA and Title VII).

Doe argues that the District retaliated against her after she filed her OHR complaint by "removing her from the school in January and taking away job duties; transferring her in April; and [Morales's] spreading rumors about her complaint and alleged relationship with Mr. Roe, in violation of the District's policies."[4]  Pl.'s Cross-Mot. for Summ. J. at 38.  The District's motion for summary judgment does not include any challenge to the protected nature of Doe's OHR complaint or even the causal nexus between her complaint and the District's actions.  Instead, the District targets only the second element of Doe's retaliation claims, arguing that Doe "was never subjected to adverse action."  Def.'s Mot. for Summ. J. at 11.

The District mainly contends that these allegedly adverse actions never took place, or at least that the record cannot support a finding that they did.  It contends that no admissible evidence establishes that Morales spread any rumors about Doe's relationship with Roe or any other matter related to her complaint, and that no transfer from the school ever occurred.  This argument fails across the board.  Doe has offered admissible—and at this stage, undisputed—evidence that Morales spread confidential information about her complaint to her coworkers:  another DBH social worker, who was supervised by Morales, has submitted a declaration stating that Morales discussed the content of Doe's complaint and aspects of her relationship with Roe on numerous occasions beginning in January 2018 and continuing over the course of several weeks.  Pl.'s SOMF ¶¶ 202–06; Def.'s Resp. ¶¶ 202–06; Pl.'s Ex. 2 (Fakunle Decl.) ¶¶ 4–8.  Moreover, to the extent that Doe also relies on her own testimony about what Morales told *other* coworkers, that evidence can still be considered at the summary judgment stage so long as it is "capable of being converted into admissible evidence," and Doe could avoid any hearsay problem by calling Morales to testify

---

[4] Doe no longer presses the claim that the District unlawfully retaliated against her when Morales "coerced [her] to drop her charge against DBH and pursue it solely against DCPS."  Am. Compl. ¶¶ 120, 124.

at trial. *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). (The same is true of the coworker's declaration and possible testimony.)

In addition, Doe identified evidence, again undisputed, that she reported to a new location as instructed in early February 2018, after taking personal leave. Pl.'s SOMF ¶ 200; Def.'s Resp. ¶ 200; Pl.'s Ex. 40 (Doe and Morales Text Messages) at 68951. And although Doe acknowledges that the April transfer was rescinded, she showed through (once again) uncontroverted evidence that DBH did issue a letter announcing her transfer to another school. Pl.'s SOMF ¶ 211; Def.'s Resp. ¶ 211; Pl.'s Ex. 35 (Transfer Letter), ECF No. 78-38; *see* Pl.'s Ex. 29 (Letter Rescinding Transfer), ECF No. 78-32 (rescinding transfer two days after issuance of transfer letter).

The District goes on to challenge the materiality of these actions. An adverse action, in the Title VII retaliation context, must be "materially adverse," meaning that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations omitted). This requires separating "significant from trivial harms." *Id.* As the Supreme Court has explained, Title VII "does not set forth a general civility code for the American workplace." *Id.* (quotation omitted). The Act prohibits "employer actions that are likely to deter victims of discrimination from complaining"—not "petty slights, minor annoyances, and simple lack of good manners." *Id.*

The District contends that the alleged adverse actions are too trivial to count. But a reasonable jury could conclude that employees would likely be deterred from coming forward with sexual harassment complaints if they knew that the content of the complaints would be shared with their coworkers. And the District's argument about the January removal is premised on its contention that no removal occurred (*i.e.*, that Doe was instructed to report to a different work location and never did). But, as discussed above, that premise is not beyond dispute based on the

record.  Finally, though a reasonable jury could conclude that a transfer rescinded after two days is too immaterial to deter complaints, a reasonable jury could also reach the opposite conclusion. *See Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 913 (8th Cir. 2011) (concluding that a termination was a materially adverse action even though it was rescinded two days later).

### C.  Doe Is Entitled to Partial Summary Judgment (in Part) on the District's Defenses

In her own motion for partial summary judgment, Doe seeks summary judgment on several of the District's defenses.  The District concedes that summary judgment is appropriate as to five of them:  its third defense that Doe failed to exhaust administrative remedies or comply with filing requirements; its eleventh defense that Doe failed to mitigate damages; its twelfth defense that Doe's claims are barred by laches or the applicable statute of limitations; and its sixteenth and eighteenth defenses of collateral estoppel or res judicata.  *See* Def.'s Reply at 18.  The Parties disagree about four other defenses.

One of those, the District's fourth defense, is that Doe "failed to timely file a grievance or otherwise failed to protect herself from the alleged conduct."  Answer at 10.  The District has clarified that this defense is "essentially its *Faragher-Ellerth* defense," through which it argues that it had an established complaint procedure to address sexual harassment issues and that Doe unreasonably delayed in complaining to her supervisor by waiting until September 2017.  Def.'s Reply at 18; *see* Def.'s Mot. for Summ. J. at 7–11.  Because Doe did not report the alleged harassment in a quick and complete manner—and because the District did take some action to prevent and correct the harassment—a reasonable jury could conclude that the District is entitled to the *Faragher-Ellerth* defense (at least in part).  Doe's summary judgment motion is therefore denied as to this defense.

The District's seventh defense is that Doe's injuries resulted from her "own intentional or otherwise wrongful conduct."  Answer at 10.  Alluding to Doe's intimate relationship with Roe, the District contends that it is entitled to argue to a jury that "the way in which Mr. Roe interacted with Plaintiff within the workplace was influenced or informed by the way the Plaintiff intentionally interacted with him outside the workplace."  Def.'s Reply at 19.  As murky as this description is, the Court is unable to conclude that it is viable.

Because "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome,'" an employer can argue that the allegedly harassing conduct was in fact consensual, not unwelcome.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986).  But the District does not appear to contend that any actions underlying Doe's sexual harassment claims were consensual.  The District has offered no authority to support the conclusion, for example, that the consensual nature of some sexual acts occurring within the context of an intimate relationship means that other acts—which were themselves *unwelcome*—cannot be the basis of a sexual harassment complaint.  Moreover, a previous consensual relationship does not remove liability for sexual harassment that occurs after the relationship ended.  *See Williams v. Herron*, 687 F.3d 971, 978 (8th Cir. 2012).  The District therefore cannot use the existence of a consensual relationship as a defense to liability for sexual harassment based on concededly unwelcome conduct, and Doe is entitled to summary judgment on this defense.  (It is plausible, however, that Doe's relationship with Roe could provide context and bear on other aspects of Doe's claims.)

The District's ninth defense is that Doe's injuries were not "proximately caused by the District or its employees, agents, or servants acting within the scope of their employment," and its related tenth defense is that it is not liable for the "unforeseeable, intervening criminal acts of third parties."  Answer at 11.  The District argues in particular that Roe acted criminally and outside the

scope of his employment when he sexually assaulted Doe.  Def.'s Reply at 19.  Such a defense is inapposite under the *Faragher-Ellerth* framework for vicarious liability, where employers can be liable for harassing conduct of employees, taken outside the scope of employment, if the conduct was "made possible by abuse of [the employee's] supervisory authority."  *Faragher*, 524 U.S. at 801–02.  The District must therefore defend itself from vicarious liability by arguing that Roe was not a supervisor or by establishing the *Faragher-Ellerth* affirmative defense, not by making the obvious point that Roe's disturbing nonconsensual conduct was not in his job description.

These defenses could have more success, however, in the negligence context.  The District argues that the extreme nature and criminality of Roe's sexual assaults limit its liability in negligence because Roe's actions were not foreseeable.  Def.'s Reply at 20.  Foreseeability is an "axiomatic" requirement of a negligence regime.  *Kennedy v. Berkel & Co. Contractors*, No. 17-cv-1248, 2020 WL 4903896, at *6 (D.D.C. Aug. 20, 2020) (quotation omitted).  Basic tort principles establish that where the immediate cause of the injury is an intervening criminal act of a third party, the foreseeability required is "more exacting."  *Id.* (quoting *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 912 (D.C. Cir. 2006)); *see Lacy v. D.C.*, 424 A.2d 317, 323 (D.C. 1980); *see also Ellerth*, 524 U.S. at 758–59 (citing the Restatement (Second) of Agency when explaining the employer's own negligence as a basis for liability, and stating that an employer can be liable "where its own negligence is a cause of the harassment").  "[A]lthough normally the defendant need not have foreseen the precise injury," or "the particular method in which a harm would occur," defendants are not liable for an intervening criminal act unless it was foreseeable.  *Lacy*, 424 A.2d at 322–23 (approving a jury instruction that required a showing that defendants had knowledge that *assault* would occur, rather than any type of harm) (quotations omitted).  Put simply, the District is entitled to argue to the jury that Roe's sexual assaults were not a foreseeable

result of its negligence.  The Court therefore declines to grant summary judgment on these defenses to the extent that the District seeks to establish that Roe's sexual assaults were not foreseeable, such that the District's negligence was not the proximate cause of the harm Doe experienced.

*       *       *

To sum up, the Court grants Doe's motion for partial summary judgment in part:  the motion is granted with respect to the defenses that the District no longer advances (its third, eleventh, twelfth, sixteenth, and eighteenth defenses); the seventh defense to the extent that the District argues that the consensual nature of the relationship between Roe and Doe undermines the unwelcome nature of the conduct at the basis of Doe's sexual harassment claims; and the ninth and tenth defenses to the extent the District argues that it cannot be vicariously liable for Roe's conduct under the *Faragher-Ellerth* framework because his conduct fell outside the scope of his employment.  The Court denies Doe's motion on the fourth defense, allowing the District to present its *Faragher-Ellerth* affirmative defense regarding Doe's delay in reporting harassment. The Court also denies summary judgment on the ninth and tenth defenses to the extent that the District argues against its own direct liability for negligence based on the lack of foreseeability of Roe's conduct.  The District's motion for summary judgment is denied in full.

## II.    Motion for Sanctions

During the course of discovery, Doe sought sanctions for spoliation based on the District's failure to preserve the text messages of Roe, the Principal, and Morales.  When analyzing a motion for sanctions under Rule 37(e)(1), courts consider whether (1) electronically stored information (ESI) "should have been preserved in the anticipation or conduct of litigation"; (2) "a party failed to take reasonable steps to preserve" the ESI; (3) ESI "was lost as a result"; and (4) the ESI "could not be restored or replaced by additional discovery."  Fed. R. Civ. P. 37(e)(1) advisory committee's

note to 2015 amendment.  Once these threshold requirements are met, the Court "may impose proportional sanctions upon the finding of prejudice."  *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 46 (D.D.C. 2019).  In other words, "once a finding of prejudice is made, the court has broad discretion to impose sanctions but may order measures no greater than necessary to cure the prejudice."  *Id.* at 49.

### A. The District Failed to Take Reasonable Steps to Preserve Text Messages That It Should Have Preserved, Which Were Irredeemably Lost as a Result

A party "must preserve potentially relevant evidence that might be useful to an adversary" when it "anticipates litigation."  *Id.* at 45.  Doe contends that the District's obligation to preserve the text messages of Roe, the Principal, and Morales began on January 10, 2018, when the District received notice of Doe's OHR complaint.  Pl.'s Mot. for Sanctions at 13 (citing Pl.'s Ex. K (Tapp Tr.) at 158–59).  The District does not meaningfully dispute this point; it does not, for instance, contend that no D.C. agency was on notice of a preservation duty on that date, which was the date that DBH's sexual harassment officer "received notification from the complainant, Ms. Doe, that she wanted to discuss a possible sexual harassment matter with him."  Pl.'s Ex. K (Tapp. Tr.) at 158–59; *cf. Eller v. Prince George's Cnty. Pub. Schs.*, No. TDC-18-3649, 2020 U.S. Dist. LEXIS 234367, at *11 & n.3 (D. Md. Dec. 14, 2020) (concluding that the preservation duty began when defendants received notice of plaintiff's EEOC charge, not when plaintiff filed her EEOC charge).

Instead, the District attempts to identify different points at which DCPS and DBH received notice.  *See* Def.'s Opp'n to Pl.'s Mot. for Sanctions ("Def.'s Opp'n") at 5, ECF No. 60.  The District contends that only DBH, and not DCPS, had notice of the initial January 2018 administrative complaint, and that is why DCPS did not issue any preservation notice that month. *Id.*  But DCPS, not DBH, was the respondent named in Doe's administrative complaint.  Pl.'s Ex. N (Notice of Charge of Discrimination and Mandatory Mediation) at 1, ECF No. 58-14.  Further,

26

a notice of the charge of discrimination was sent to DCPS on March 5, 2018, which specifically stated that DCPS was "required to preserve all records which may be relevant to this charge of discrimination." *Id.* at 2.

The Court concludes that the latest date that the District would have had notice of its preservation duty—even if it were to analyze the D.C. agencies involved separately—was March 5, 2018. By that date, both DCPS and DBH had received notice of the administrative complaint. *See Eller*, 2020 U.S. Dist. LEXIS 234367, at *11 & n.3. No later than March 5, 2018, then, the District had a duty to preserve ESI. It was after that date, however, that Roe's government-issued phone was wiped of data and that text messages were deleted from the Principal's and Morales's phones.

The Parties focus much of their attention on another subsidiary question: whether the District should have preserved the text messages that were lost. Doe contends that the answer is yes because each custodian of the text messages (Roe, the Principal, and Morales) is a "critical witness" involved in the litigation. Pl.'s Mot. for Sanctions at 14. The District appears to have shared this understanding; the D.C. Attorney General's Office sent litigation hold letters in May 2019 to the general counsels of DBH and DCPS, "instructing that all employees with knowledge relevant to Plaintiff's Complaint including, but not limited to, [the Principal], [Roe], [Roberta] Kleekpo, Erica Barnes and Luis Morales, must be instructed to preserve all documents, defined to include electronic documents such as . . . text messages." Pl.'s Ex. G (Def.'s Resps. to Pl.'s Second Set of Interrogs.) ¶ 3, ECF No. 58-7. The District now argues, however, that Doe must prove that the lost text messages were *relevant* in order to show that they should have been preserved.

The Court disagrees.  The duty to preserve evidence extends to that which is "*potentially* relevant*," not *certainly* relevant.  *Borum*, 332 F.R.D. at 45 (emphasis added); *see also, e.g.*, *Zhi Chen v. D.C.*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011).  As other courts have described the preservation duty, a party should retain documents "made by individuals likely to have discoverable information that the disclosing party may use to support its claims or defenses"; "documents prepared *for* those individuals"; "information that is relevant to the claims or defenses of *any* party"; and information that is "relevant to the subject matter involved in the action."  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217–18 (S.D.N.Y. 2003) (citing Fed. R. Civ. P. 26) (quotations omitted); *see also, e.g.*, *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 339 (M.D. La. 2006).  The duty therefore extends to "employees likely to have relevant information—the 'key players' in the case."  *Zubulake*, 220 F.R.D. at 218.  There is no disputing that Roe (the alleged harasser), the Principal (his direct supervisor), and Morales (the alleged retaliator), were key players in this case.  Their text messages should have been preserved.

Doe has also shown that the District failed to take reasonable steps to preserve the lost messages.  Undisputedly, Roe and the Principal never received a litigation hold notice and were never instructed to preserve text messages.  The single litigation hold notice sent to DCPS's general counsel in May 2019—over a year after the District became obligated to preserve evidence—was never forwarded to them.  Pl.'s Ex. M (Woods-Jefferson Tr.) at 46–50.  And while the record is not clear about whether Morales was instructed to preserve texts (he testified that he was not, while DBH's 30(b)(6) designee testified that two litigation hold notices were sent to him), the District nevertheless fell short of its preservation obligation even construing that dispute in its favor.  Pl.'s Ex. H (Morales Tr.) at 75–76; Pl.'s Ex. K (Tapp Tr.) at 148–51, 162–64.  A litigation hold is "only the beginning" of a party's preservation obligations. *Zubulake v. UBS Warburg LLC*, 229 F.R.D.

422, 432 (S.D.N.Y. 2004).  "Once a litigation hold is in place, a party and its counsel must make certain that all sources of potentially relevant information are identified and placed on hold," and then "counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched."  *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 437 (S.D.N.Y. 2010) (quotations and brackets omitted).

The District failed to fulfill its obligations by a long shot, with no evidence of preservation efforts beyond the partial distribution of litigation hold notices.  Had the District taken appropriate measures to protect ESI in this case, many lost text messages would still be available.  Reasonable measures would have prevented, for example, the wiping of Roe's phone upon his resignation; deletion of the Principal's texts when she received a new phone; and the non-preservation of Morales's texts before he implemented a password update.  Because of the District's shortcomings, any message sent among Morales, Roe, and/or the Principal—with no other custodian on the receiving end who could retain the message—was irredeemably lost.  *See Borum*, 332 F.R.D. at 46.  The Court therefore concludes that the threshold requirements of Rule 37(e) are met, meaning that Doe is entitled to sanctions if she suffered prejudice from the loss of information.

### B.  Doe Has Suffered Some Prejudice from the District's Failure to Preserve the Lost Text Messages

To evaluate prejudice from the loss of ESI, courts consider "the information's importance in the litigation."  Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment.  The extent of prejudice in a given case "ranges along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof."  *Borum*, 332 F.R.D. at 47 (quotation and brackets omitted).  Rule 37(e) "leaves judges with discretion to determine how best to assess prejudice in particular cases" and where to allocate the burden of proving prejudice.  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  In cases where it is difficult to determine

the content of lost information, "placing the burden of proving prejudice on the party that did not lose the information may be unfair." *Id.* But it may be reasonable to place the burden of showing prejudice on that party when the content of the information is "fairly evident," the information "appear[s] to be unimportant," or "the abundance of preserved information" seems "sufficient to meet the needs of all parties." *Id.*

Here, the content of the text messages is largely unknown. Roe, the Principal, and Morales all testified to sending work-related texts. Pl.'s Suppl. Ex. 1 (Roe Tr.) at 55–56, 62; Pl.'s Ex. I (Principal Tr.) at 86–88, 97–98; Pl.'s Ex. H (Morales Tr.) at 66–68, 87. But none of them recalled with certainty whether those texts discussed matters relevant to Doe or to the subject matter of this case. Pl.'s Ex. I (Principal Tr.) at 90 (unable to "rule out the possibility" that she exchanged text messages about Doe with others); Pl.'s Ex. H (Morales Tr.) at 86 ("unsure of what messages" he exchanged regarding Doe); *see* Pl.'s Suppl. Ex. 1 at 64 (did not "recall discussing staff members via text"). And while the difficulty of determining the content of the lost information favors a lightened burden on Doe as the movant, the summary judgment record that otherwise exists, through other documentary evidence and witness testimony, is fairly robust. For instance, the Parties have access to all messages sent and received by Doe herself, as well as those that Roe, the Principal, or Morales sent to or received from others. And as the above analysis of the Parties' cross-motions for summary judgment shows, the loss of evidence did not foreclose Doe from advancing her claims, which the Court now allows to proceed on the record before it. Given these countervailing considerations, the Court will assess prejudice according to a common spoliation standard: whether Doe has "come forward with plausible, concrete suggestions as to what the destroyed evidence might have been." *Borum*, 332 F.R.D. at 47 (quotations omitted). The Court will assess the importance of that possible evidence in light of the rest of the record.

Doe puts forth a few suggestions about what the lost text messages might have revealed. First, she says that the Principal and Roe may have exchanged text messages about the complaints brought against Roe—both by Doe and by other women—which could help show a pattern of misconduct by Roe; the Principal's knowledge of that misconduct; and the inadequate nature of the District's response to allegations of misconduct.  It is plausible that texts of this nature between the Principal and Roe existed.   The Principal once shared information with Roe about an investigation opened against him for corporal punishment (though by email), and the two may have had similar conversations by text message.  Pl.'s Ex. I (Principal Tr.) at 144–50.  But it is unlikely that these communications—or, more precisely, *only* these communications—would show a pattern of misconduct by Roe and the Principal's knowledge of it.  The existence of similar complaints brought against Roe by other employees, and the Principal's knowledge of them, would likely have been discoverable by means other than text messages between Roe and the Principal. For instance, a complaint by another teacher that Roe repeatedly touched her inappropriately and without her consent was evidenced in the record by an official complaint to DCPS, communications between the teacher and the Principal, and related testimony.  *See*, *e.g.*, Pl.'s SOMF ¶ 170 (citing exhibits).   However, such text messages could have supported Doe's arguments about the inadequacy of the District's response as to *her* complaints.  The record is sufficient for Doe to advance her position, but contemporaneous text messages between Roe and the Principal could help Doe understand, and show a jury, how *her* complaint was treated.

Second, Doe suggests that text messages between Roe and the Principal could reveal the extent of supervisory authority that Roe exercised over Doe, because the Principal could not recall specific instructions she gave Roe about his authority.  *See* Pl.'s Ex. 11 (Principal Tr.) at 63–64. The likelihood that relevant conversations would have taken place by text message, as opposed to

email or in person, is hard to assess.  But there is clear evidence in the record that the Principal did assign Roe as the administrator who would oversee Doe and that Doe was a member of the mental health team, which reported to Roe.  Pl.'s SOMF ¶¶ 35, 38–39.  While communications between Roe and the Principal could possibly provide further color to the nature of Roe's authority, Doe is not precluded from proving Roe's status as her supervisor on the current record.

Third, Doe proposes that the lost text messages could have revealed further instances in which Morales spread false and confidential information about Doe to her coworkers, which she claims was a retaliatory act.  However, she does not allege that Morales improperly made such disclosures to the Principal, and any messages that Morales sent to other coworkers could be discovered from them.  *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("Because electronically stored information often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere.")

Doe's final suggestion is that text messages between Morales and the Principal, or even the *lack* of text messages, could help her prove that the District responded negligently to her harassment complaints.  Morales testified that he was unsure whether he exchanged messages with the Principal.  Pl.'s Ex. H (Morales Tr.) at 87.  The record already shows—or at least supports the conclusion—that Morales involved the Principal in responding to Doe's complaints when he scheduled a meeting among the three of them.  Pl.'s SOMF ¶¶ 116–17, 119–20.  The District has not contended that Morales made any other communication to the Principal, by text, email, or otherwise, that would reflect further action in response to Doe's complaint.  So while having a complete log of texts between Morales and the Principal could confirm that no relevant communications between them took place, nothing in the record would support the opposite conclusion.

On the whole, the Court concludes that the loss of text messages likely has a moderate impact on Doe's ability to prove her claims. Whether or not text messages between Roe and the Principal or between Morales and the Principal existed, the fact of their existence *or non-existence* would be relevant to Doe's argument that the District responded inappropriately to *her* complaints, and neither fact can be proven now that the text messages are lost. Still, Doe has put forward other relevant evidence to support her argument about the inadequacy of the District's response, and she has not established a high likelihood that the text messages would have substantially improved her case. As for Roe's supervisory authority, the Court concludes that the current record is sufficient to make prejudice to Doe on that issue negligible. And the Court declines to conclude that Doe was meaningfully prejudiced on the issue of Roe's pattern of misconduct towards other women, given the high likelihood that relevant evidence would have been discoverable by other means.

Apart from the spoliation's impact on Doe's ability to prove her case, she also argues that her counsel "has expended considerable time and resources uncovering the truth about the District's actions." Pl.'s Mot. for Sanctions at 24. That much is clear. Since becoming aware of the spoliation, Doe's counsel has spent time conferring with opposing counsel and has deposed several witnesses regarding the loss. Doe has also, of course, incurred expense in the filing of the sanctions motion. Altogether, the Court concludes that the spoliation of the text messages caused a moderate amount of prejudice to Doe—both monetarily and in her ability to press her claims—and it will assess appropriate sanctions accordingly.

### C.  Sanctions Are Warranted Under Rule 37(e)(1)

Doe seeks as sanctions:  (1) a jury instruction that it may consider the District's spoliation when evaluating the evidence; (2) an order permitting Doe to argue to the jury that the text messages would have contained evidence supporting her claims; (3) an order forbidding the

33

District from arguing that the missing messages never existed or would have supported its defenses; (4) an order prohibiting the District from offering evidence about the contents of the lost messages; and (5) attorney's fees and costs Doe expended litigating the spoliation issue, including filing the motion for sanctions.

When determining what sanctions to impose under Rule 37(e)(1), "[m]uch is entrusted to the court's discretion." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment. But there are some boundaries. Most fundamentally, the Court must calibrate the severity of the sanctions to be proportional to the prejudice suffered. *See id.* There is also a hardline rule: a party cannot be awarded the sanctions listed in subsection (e)(2) under subsection (e)(1); such sanctions are only permitted if the Court finds that the party responsible for the spoliation "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). Those sanctions include (a) "presum[ing] that the lost information was unfavorable to the party"; (b) "instruct[ing] the jury that it may or must presume the information was unfavorable to the party"; or (c) dismiss[ing] the action or enter[ing] a default judgment." *Id.* When the moving party has not proven intent, courts must take care to "ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are permitted under subdivision (e)(2)" only upon that finding. Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment.

Besides Doe's request for monetary sanctions, the District did not address (in either its briefs or at oral argument) whether the sanctions she seeks are appropriate. The District has not contended, for instance, that the combined effect of Doe's requested sanctions would amount to measures that are only permitted under subsection (e)(2). The Court will therefore grant the non-monetary sanctions requested, but only as to the issue of whether the District adequately responded to Doe's complaints, because the moderate prejudicial effect on Doe's ability to press

her claims bore on that issue (but not Roe's pattern of misconduct, Roe's supervisory authority, or Morales's breaches of confidentiality).

As for monetary sanctions, the District contends that such relief is inappropriate because attorney's fees and costs are punitive sanctions that can only be issued—like the sanctions explicitly listed in subdivision (e)(2)—upon a finding of intent. The Court disagrees. The cases that the District relies on for this argument, including *Shepherd v. American Broadcasting Cos.*, 62 F.3d 1469 (D.C. Cir. 1995), deal with the inherent authority of courts to issue sanctions, not Rule 37(e). As amended in 2015, Rule 37(e) "forecloses reliance on inherent authority . . . to determine when certain measures should be used." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment; *see also* 8B Charles Alan Wright, et al., *Federal Practice and Procedure* § 2284.2 (3d ed. 2022) (stating that "the 2015 provision supplants inherent authority"). Courts utilized their inherent power in the spoliation context "to sanction attorney or party misconduct," and so some showing of misconduct was required to issue a sanction for spoliation under that power. *Shepherd*, 62 F.3d at 1475. Since the 2015 amendment, however, "[m]any courts have imposed monetary sanctions under Rule 37(e)(1)." *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 237–38 (D. Minn. 2019); *see Spencer v. Lunada Bay Boys*, No. CV 16-02129, 2018 WL 839862, at *1 (C.D. Cal. Feb. 12, 2018); *Borum*, 332 F.R.D. at 49–50. This Court also concludes that an award of attorney's fees and costs is appropriate here.

## Conclusion

For these reasons, the Court denies the District's motion for summary judgment and grants in part and denies in part Doe's cross-motion for partial summary judgment. The Court will impose sanctions against the District under Federal Rule of Civil Procedure 37(e)(1). An order will issue contemporaneously with this opinion.

DATE:  February 14, 2023

_____

CARL J. NICHOLS
United States District Judge